COURT OF
APPEALS

                                                    EIGHTH DISTRICT
OF TEXAS

                                                               EL
PASO, TEXAS

 

                                                                              )

ESTELLA LIRA, INDIVIDUALLY
AND AS      )

NEXT FRIEND OF HOPOLITO
LIRA, JR.,        )     

and
DANIEL LIRA,                                              )                    No. 
08-01-00250-CV

                                                                              )

Appellant,                          )                             Appeal from

                                                                              )     

v.                                                                           )                     143rd District Court

                                                                              )

ORVILLE DIAZ CERNA, M.D.,                          )                 of Reeves County, Texas

                                                                              )

Appellee.                           )                 (TC# 00-08-16786-CVR)

 

O
P I N I O N

 

Estella
Lira, individually and as next friend of Hipolito
Lira, Jr. and Daniel Lira,[1]
filed a medical malpractice suit against Dr. Orville Diaz Cerna.  The Liras have appealed an order of dismissal
pursuant to Article 4590i, section 13.01(e) of the
Medical Liability and Insurance Improvement Act.  Tex.Rev.Civ.Stat.Ann. art. 4590i,  ' 13.01(e)(Vernon
Supp. 2002).[2]  Dr. Cerna appeals
the trial court=s denial
of his motion for sanctions.  Finding no
error, we affirm.

FACTUAL AND PROCEDURAL SUMMARY








Hipolito Lira initially sought treatment on September 27,
1999 from Dr. Cerna and a physician assistant,
Michelle Cser, at Pecos Valley Rural Health Clinic
for fatigue and swelling of the hands, feet, eye, and facial area.  Despite continued treatment, his health
deteriorated rapidly and he died on October 23, 1999.  On August 18, 2000, the Liras filed suit,
alleging Dr. Cerna and Cser
were negligent in their diagnosis and treatment.  In their  first amended original petition, the
Liras added the City of Pecos as a defendant.[3]  The Clinic and Reeves County Hospital were added
as defendants in the second amended petition. 
In their third amended petition, the Liras alleged vicarious liability
of Dr. Cerna based on Cser=s negligence.  Within 180 days of filing suit, the Liras
served Dr. Cerna with the reports of two medical
experts.  From this point forward, a time
line will more effectively detail the procedural history.  The following events occurred between April and
June 2001:

$ April 16 -- Dr. Cerna
filed a motion to dismiss pursuant to Section 13.01(e) and a motion for summary
judgment contending that he had no physician-patient relationship with Mr. Lira
and was not liable on any grounds alleged in the Liras=
second amended petition.  At
approximately the same time, all four defendants--Dr. Cerna,
Cser, the Clinic, and the Hospital--filed a joint
motion to dismiss the entire lawsuit because the plaintiffs had not properly
joined the three adult children of Mr. Lira who were additional wrongful death
beneficiaries.

 

$ May 17 -- The Liras reached a
settlement with Cser, the Clinic, and the Hospital
whereby the defendants would pay $75,000 in exchange for final releases.  Purportedly, the adult children were also to
release their claims against all four defendants--including Dr. Cerna--for $5,000 each.

 

$ May 18 -- Dr. Cerna
learned of the settlement with the other defendants.  The Liras=
attorney suggested that based on the settlement, the defendants would not need
to pursue the joint motion to dismiss which alleged a defect in parties.  Based open this representation, Dr. Cerna did not move forward with that motion.  Consequently, the hearing proceeded only on
Dr. Cerna=s
Section 13.01 motion to dismiss and motion for summary judgment.  The trial court heard the arguments of
counsel but did not rule from the bench.  After the hearing, the court--through its
court coordinator--asked counsel for Dr. Cerna to
prepare an order granting the motion to dismiss.  Counsel did so, forwarding a copy to the
Liras=
attorney.








$ May 21 -- The Liras filed a notice of nonsuit.  The trial
court signed an order the same day, dismissing the claims against Dr. Cerna without prejudice.  

 

$ May 30 -- Dr. Cerna
filed an objection to the nonsuit, asking that the
order granting it be vacated and the case dismissed, with prejudice,
pursuant to his Section 13.01 request.

 

$ June 1 -- A scheduled hearing on the
prove-up of the settlement was postponed until the court decided whether to
vacate the nonsuit and dismiss the Liras= claims with prejudice.  The Liras=
attorney advised the court that the settlement was still in place.  The court vacated the nonsuit
and dismissed the claims against Dr. Cerna with
prejudice.  The doctor=s request for attorneys= fees and costs, mandated by Section
13.01(e), was withdrawn in exchange for the dismissal with prejudice.

 

$ June 4 -- Dr. Cerna
filed his first motion for sanctions, complaining of the Liras= conduct in filing the notice of nonsuit in an effort to circumvent the trial court=s dismissal with prejudice.  The record does not reveal what transpired
between June 1 and June 4 to prompt this motion.  All of the actions alleged in the motion as a
basis for sanctions had transpired by the June 1 hearing during which counsel
withdrew the request for fees and costs.

 

$ June 7 -- Dr. Cerna=s counsel learned that the adult
children had rescinded their releases.

 

$ June 8 -- The trial court conducted
the prove-up of the settlement with Cser, the Clinic,
and the Hospital and rendered judgment in accordance with the parties=
agreement.  The written judgment
expressly excluded any claims by the Liras against Dr. Cerna
based upon his actions as Cser=s
supervising physician.  Dr. Cerna asked for clarification as to whether the settlement
included the adult children since the releases they had signed were
rescinded.  His counsel objected to the
rescissions, advising the court that Dr. Cerna had
relied on these releases in agreeing not to pursue dismissal based upon the
defect in parties and in agreeing to withdraw that part of the Section 13.01
dismissal motion seeking recovery of attorneys= fees as additional sanctions.  Dr. Cerna asked the
court to disregard the rescissions and urged his motion for sanctions, seeking
fees and costs.  The court did not rule
from the bench.

 

$ June 18 -- Dr. Cerna
filed a second motion for sanctions, alleging improper conduct with regard to
filing the notice of nonsuit and with regard to
unethical conduct in misrepresenting facts to the doctor=s
attorney concerning the releases and rescissions executed by the older
children.

 

$ June 28 -- The Liras responded to the
second motion for sanctions, alleging that the inclusion of Dr. Cerna in the releases was a mistake, that the older
children had not received payment of any consideration from Dr. Cerna and, in effect, that Dr. Cerna=s belief that the $5,000 each of the
adult children was to receive would be paid from the $75,000 tendered by the
other three defendants was Aa
fantasy.@

 








$ June 29 -- The trial court denied Dr. Cerna=s
request for sanctions.

ADEQUACY OF THE EXPERT REPORTS

In Point of Error No. One, the Liras claim the trial court
erred in granting Dr. Cerna=s
motion to dismiss on the grounds that the expert reports were inadequate.  We begin with the standard of review.  

Standard of Review

In
reviewing a trial court=s
dismissal for failure to provide an adequate expert report, we apply an abuse
of discretion standard.  American Transitional Care Ctrs. of
Texas, Inc. v. Palacios, 46 S.W.3d 873, 877-78 (Tex. 2001).  An abuse of discretion occurs when the trial
court=s
judgment is made without reference to guiding rules or principles, or is
arbitrary or unreasonable.  See Stelly v. Papania, 927 S.W.2d
620, 622 (Tex. 1996); Downer v. Aquamarine Operators, Inc., 701 S.W.2d
238, 241-42 (Tex. 1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

The Act

Medical
malpractice claims are governed by the Texas Medical Liability and Insurance
Improvement Act.  See Tex.Rev.Civ.Stat.Ann.
art. 4590i, '
1.01, et seq. (Vernon Supp. 2002).  Section 13.01 of the Act requires a claimant
to file an expert report:

(d) Not later than
the later of the 180th day after the date on which a health care liability
claim is filed or the last day of any extended period established under
Subsection (f) or (h) of this section, the claimant shall, for each physician
or health care provider against whom a claim is asserted:

 

(1)
furnish to counsel for each physician or health care
provider one or more expert reports, with a curriculum vitae of each expert
listed in the report; or

 

(2)
voluntarily nonsuit the
action against the physician or health care provider.

 








Tex.Rev.Civ.Stat.Ann. art. 4590i, '
13.01(d).  If the claimant fails
to comply with these requirements, the physician or health care provider may
file a motion seeking as sanctions attorney=s
fees and costs, forfeiture of any bond, and dismissal with prejudice.  See id. Section
13.01(e).  AA
court shall grant a motion challenging the adequacy of an expert report only if
it appears to the court, after hearing, that the report does not represent a
good faith effort to comply with the definition of an expert report in
Subsection (r)(6) of this section.  Id. Section 13.01(l). 
The statute defines Aexpert
report@ as:

[A] written report
by an expert that provides a fair summary of the expert=s
opinions as of the date of the report regarding applicable standards of care,
the manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.

 

Id.
Section 13.01(r)(6).








 In determining whether an expert report
represents a good-faith effort to provide a fair summary of the expert=s opinions, the trial court should look
no further than the four corners of the report. 
Palacios, 46 S.W.3d at 878.  The expert report must contain the expert=s opinions on three areas:  (1) the applicable standard of care; (2) the
manner in which the physician or health care provider failed to meet the
standard of care; and (3) the causal relationship between the alleged failure
and the harm claimed by the plaintiff. 
While the report need not marshal all of a claimant=s proof, it must include the expert=s opinion on each of these
elements.  Id., citing
Hart v. Wright, 16 S.W.3d 872, 877 (Tex.App.--Fort
Worth 2000, pet. denied).  In
setting out the expert=s
opinions on each element, the report must provide sufficient information to
fulfill two purposes it if is to constitute a good faith effort:  (1) the report must inform the defendant of
the specific conduct the claimant has called into question; and (2) the report
must provide a basis for the trial court to conclude the claims have
merit.  Id. at
879.  A report does not fulfill
these purposes if it only states the expert=s
conclusions about the standard of care, breach, and causation, or if it omits
any of the statutory requirements.  Id.

Stipulation of the Parties

At
the hearing on May 18, the trial court requested that the parties stipulate to
several factual issues relevant to the standard of care.   The parties agreed that: 

$ this is a
medical malpractice case governed by Article 4590i;  

 

$ the
applicable rules of the Texas State Board of Medical Examiners are those that
deal with a medically under-served community and a rural health setting, which
is independent from a physician assistant practice on-site; 

 

$ the events at
issue did not occur while Cser was working at Dr. Cerna=s
office;

 

$ Dr. Cerna
was an independent contractor with Reeves County Hospital; 

 

$ Cser was an
employee of the Hospital; 

 

$ Cser saw
patients at the Clinic; and 

 

$ Dr. Cerna
was Cser=s
principal supervising doctor, but there were two other doctors who could
supervise if Dr. Cerna were not available.  

 

We
turn now to the contents of the reports tendered by the Liras= experts. The reports are comprised of
two letters and an affidavit from Dr. Howard A. Parness
and a letter from Dr. Lige B. Rushing.  Because this case ultimately turns on the
adequacy of the reports concerning the applicable standard of care, we will
highlight references thereto.

The Parness Reports

Dr.
Parness=s
letter dated May 10, 2000 states in pertinent part:








Mr. Lira is a
53-year-old married male who seems to have been suffering from longstanding cardiomegaly and hypertension and probably renal
insufficiency.  Review of his records
seem to indicate that the patient was in congestive heart failure and
subsequently went downhill and died from complications of the congestive heart
failure.

 

.          .          .

 

According to his
wife=s
testimony, both the patient and his wife went to the office a number of times,
but it seems like he was not examined during these occasions, and the tests
that were run just prior to his death were not transmitted to the patient nor
his wife.  It does appear that this
gentleman was quite ill during that time and should have either been seen or
worked up further.  It also appears that
had this happened, the outcome might have been different.

 

A follow-up letter dated June 17,
2000 added the following:

 

In further analysis
of the additional records sent to me, it appears that this patient was
profoundly hypothyroid, and died of complications of myxedema.  It appears that this was not recognized when
he was seen a month prior to his death, and when it was recognized the few days
before his death, it does not appear that the physician appreciated the extent
of Mr. Lira=s
illness.  The fact that the diagnosis was
made rather late was definitely contributory to this patient=s death.  I don=t
believe that treating him a day or two earlier would have made a difference in
his survival, but certainly recognizing the extent of the problem and possibly
treating him symptomatically might have kept him alive long enough for the
thyroid disease to be reversed with treatment. 


 

We quote next from the affidavit
of Dr. Parness:

 

I am a practicing
licensed physician in the State of Texas. 
. . .  I have reviewed the medical
records and reports from Pecos Valley Rural Health Clinic and Reeves County
Hospital concerning the decedent, Hipolito Lira.  It is my professional medical opinion that
the medical care and treatment afforded to Hipolito
Lira, deceased, fell below the reasonable standard of care within Reeves
County, Texas, and/or a Texas county of similar size and resources.  It is further my professional medical opinion
that the lack of proper, appropriate and timely medical care and treatment to
the decedent, Hipolita [sic] Lira, was the proximate
cause of death. [Emphasis added].

 








In
his motion to dismiss, Dr. Cerna argued that Dr. Parness=s
report failed to meet any of the statutory requirements.  The Liras contend that the statement in the
May 10 letter that Mr. Lira Ashould
have either been seen or worked up further@
and the statements in the June 17 letter that Ait
does not appear that the physician appreciated the extent of Mr. Lira=s illness@
and A[t]he
fact that the diagnosis was made rather late was definitely contributory to
this patient=s death@ satisfied the first requirement of
Section 13.01(r)(6). 
We disagree.  First, neither the
letters nor the affidavit mentioned Dr. Cerna by
name.  Two pre-Palacios decisions
concluded that because the expert reports never specifically referred to the
defendant nor stated how he may have breached the standard of care, the plaintiffs had failed to comply with the
statute.  See Wood
v. Tice, 988 S.W.2d 829, 830 (Tex.App.--San
Antonio 1999, pet. denied); Horsley-Layman v. Angeles, 968 S.W.2d 533,
535 (Tex.App.--Texarkana 1998, no pet.).  Second, while Dr. Parness
opined that the lack of proper medical care was the proximate cause of death,
he did not discuss the applicable standard of care.  At most, the Parness
affidavit states that the medical care given to Mr. Lira Afell below the reasonable standard of
care within Reeves County, Texas, and/or a Texas county of similar size and
resources.@  It does not articulate what this Areasonable standard of care@ might be.  Such a conclusory
statement is insufficient to satisfy the requirement that the expert report contain a discussion of the applicable standard of
care.  As the Texas Supreme Court has
noted, the standard of care must be discussed with Asufficient
specificity to inform the defendant of the conduct the plaintiff has called
into question and to provide a basis for the trial court to conclude that the
claims have merit.@  [Emphasis added].  Palacios, 46 S.W.3d
at 875.  Because the Parness reports collectively fail to identify the
reasonable standard of care which Dr. Cerna=s conduct breached, they are
inadequate.

The Rushing Report

Dr.
Rushing=s report
contains the following observations:

In the course of my
regular practice, I treat patients with diseases similar to or identical with
Mr. Lira=s.  I am familiar with the standards of care in
cases like this.

 









.          .          .

 

The standard of
care requires that a physician provide that level of care which a reasonable
prudent physician would provide in the same or similar circumstances.  The care rendered by Michele Cser, PA-C failed to meet the accepted standards in the
following ways:

 

1. Michele Cser simply failed to comprehend the seriousness of Mr.
Lira=s
illness,

2. failed to diagnose Mr. Lira=s
myxedema in a timely fashion,

3. failed to treat Mr. Lira=s
myxedema in a timely fashion,

4. failed to seek cardiology consultation, and

5. failed to consult her supervising physician in a timely and
appropriate manner.

 

As a result of the
failures outlined above, there was a substantial delay in the diagnosis of Mr.
Lira=s myxedema and heart disease, as well as a delay in
treatment.  If Mr. Lira had been
carefully examined, diagnosed, followed up, and treated in a timely manner, he
would not have died when he did.  It is
my opinion that the delay in diagnosis and treatment was a proximate cause of
Mr. Lira=s death.

 

The care provided by
Dr. Orville D. Cerna fell below the accepted
standards in the following ways:

 

1.  failed to
appropriately supervise Michele Cser, and

2.  failed to examine or
evaluate Mr. Lira.

 

It is my opinion
that the failures listed above were proximate causes of Mr. Lira=s death.  Dr. Cerna, as the
supervising physician for Michele Cser, bears the ultimately
[sic] responsibility for the quality of care delivered by her.  The opinions expressed here are based on
reasonable medical probability. 
[Emphasis added].

 








Dr.
Cerna challenged the Rushing report because it failed
to discuss the applicable standard of care. 
While Dr. Rushing named Dr. Cerna as Cser=s
supervising physician and faulted the doctor for his failure to supervise and
evaluate Cser, he did not articulate the applicable
standard of care.  Instead, his report
summarily concluded that A[t]he standard of care requires that a physician provide that
level of care which a reasonable prudent physician would provide in the same or
similar circumstances.@   Simply stated, the report does not
demonstrate a good faith effort to provide a fair summary of the expert=s opinions:  It does not identify the standard of care for
a physician who is supervising a physician assistant at an off-site location in
a rural, medically under-served community, nor does it articulate what specific
steps Dr. Cerna was expected to take as a
supervisor.  Because it does not provide
such specificity, it fails to provide a basis for the trial court to conclude
that the claims against Dr. Cerna have merit.  

Because
the expert reports failed to meet the statutory requirements, the trial court
had no discretion but to find that they did not constitute a good faith effort
to provide a fair summary of the standard of care and how it was breached.[4]  Moreover, because the statutory 180 days had
passed when the trial court made this determination, it was required to dismiss
the Liras= claims
against Dr. Cerna with prejudice.  We find no abuse of discretion in the
dismissal of the Liras=
medical malpractice claim.  Point of Error No. One is overruled.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

 In Point of Error No.
Two, the Liras complain of the trial court=s
refusal to file findings of fact and conclusions of law.  They argue that without the findings, it is
impossible for them to determine the court=s
rationale for granting the motion to dismiss such that they are disadvantaged
with regard to presentation of this appeal. 
We disagree.








The
trial court refused to file 
findings of fact because there was no trial upon which findings
could be predicated.  Findings are
required in any case tried in the district or county court without a jury upon
timely request.  Tex.R.Civ.P. 296.   The Supreme
Court has determined that formal findings are unnecessary with regard to
sanctions, although the trial court may issue them if it so chooses.  IKB Industries (Nigeria)
Ltd. v. Pro-Line Corp., 938 S.W.2d 440 (Tex. 1997).  There, the issue was a Rule 215 sanction for
discovery abuse and the trial court=s
order recited that the court had considered the court=s
file, including pleadings, affidavits, and deposition excerpts as well as
testimony and argument of counsel.  The
order included seven pages of findings which the trial court reached Afrom the evidence before it.@ 
Id. at 441.  IKB filed a request for findings of fact to
which the trial court did not respond. 
The direct issue for resolution was whether the request for findings
extended the appellate timetable; if not, then IKB=s
appeal was untimely.  After a detailed
recitation of the purpose of findings of fact and the appropriate circumstances
for their issuance, the court summarized:

A request for
findings of fact and conclusions of law does not extend the time for perfecting
appeal of a judgment rendered as a matter of law, where findings and
conclusions can have no purpose and should not be requested, made, or
considered on appeal.  Examples are
summary judgment, judgment after directed verdict, judgment non obstante veredicto, default
judgment awarding liquidated damages, dismissal for want of prosecution without
an evidentiary hearing, dismissal for want of jurisdiction without an
evidentiary hearing, dismissal based on the pleadings or special exceptions,
and any judgment rendered without an evidentiary hearing.  A timely filed request for findings . . .
extends the time for perfecting appeal when findings and conclusions are
required by Rule 296, or when they are not required by Rule 296 but are not
without purpose--that is, they could properly be considered by the appellate
court.  Examples are judgment after a
conventional trial before the court, default judgment on a claim for unliquidated damages, judgment rendered as sanctions,
and any judgment based in any part on an evidentiary hearing.  [Emphasis added].

 








Id. at 443.  We
hasten to add that whether a request for findings extends the appellate
timetable is not the same thing as whether a party is entitled to the findings
requested.  As the italicized language
reveals, while findings may be helpful, they are not required.  Moreover, we are not convinced that findings
would even be helpful here.  Because the
trial court may review only the four corners of the expert reports when
determining whether to grant a Section 13.01 dismissal, we are restricted to
the same in our review of the trial court=s
determination for abuse of discretion.  Point of Error No. Two is overruled.

MOTION FOR SANCTIONS

In
his sole point of error, Dr. Cerna complains that the
trial court abused its discretion in denying sanctions.  He claims that the conduct of the Liras= attorney amounted to a bad faith abuse
of the judicial process and significant interference with the trial court=s core functions.  Once again, we employ the abuse of discretion
standard or review.  Palacios,
46 S.W.3d at 877, citing Koslow=s v. Mackie, 796 S.W.2d 700, 704
(Tex. 1990).

Mandatory Sanctions Pursuant to Section 13.01(e)

During
oral argument, Dr. Cerna=s
attorneys candidly conceded that, not wanting Ato
add insult to injury,@
they agreed at the June 1 hearing to withdraw Dr. Cerna=s request for attorneys= fees in exchange for the Section 13.01
dismissal.  However, an initial motion
for sanctions was filed after that hearing which urged their complaint
concerning the nonsuit; a second motion reurged the complaint surrounding the nonsuit
and added allegations of misrepresentation by the Liras=
attorney concerning the joinder of the adult
children, the settlement of the adult children=s
claims, and the recission of their releases.  In his brief, Dr. Cerna
suggests that A[i]n the absence of the courtesy offer[ed] by Dr. Cerna=s
counsel, the trial court would have been compelled to award attorneys= fees as a mandatory sanction under
section 13.01(e).@  While we agree, we believe the mandatory
statutory sanctions were waived.  The
trial court evidently thought so as well since the June 1 dismissal order
provided that ADefendant
Cerna abandoned his requests for other affirmative
relief or further sanctions.@  Consequently, the doctor is left with his
claims that sanctions were proper under the trial court=s
inherent power and under Rule 13 of the Texas Rules of Civil Procedure.  








Notice of Nonsuit

As
we have already noted, Dr. Cerna abandoned his
request for monetary sanctions at the June 1 hearing.  The purpose of that hearing from the doctor=s perspective was to vacate the nonsuit and obtain a dismissal with prejudice pursuant to
Section 13.01(e).  All of the information
concerning the Liras=
conduct in filing the notice of nonsuit was already
known to Dr. Cerna at that hearing.  Nevertheless, despite the Liras= allegedly unethical conduct in trying
to avoid a dismissal with prejudice by obtaining a nonsuit
without prejudice, Dr. Cerna abandoned his claims for
monetary damages.  We find no abuse of
discretion in the trial court=s
refusal, under either its inherent power or Rule 13, to enter sanctions on this
basis.  

Recission
of the Releases








On
April 18, 2001, Dr. Cerna, Cser,
the Clinic, and the Hospital filed a joint motion to dismiss the Liras= entire malpractice action, arguing
that they had failed to join all of the wrongful death beneficiaries.  On May 17, the Liras reached a settlement in
which Cser, the Clinic, and the Hospital agreed to pay
$75,000 to the Liras in exchange for full and final release of any and all
claims the Liras may have arising out of Mr. Lira=s
death.  According to Dr. Cerna, the settlement required the adult children to sign
releases of claims against all of the defendants, including Dr. Cerna, for $5,000 each. 
The Liras= have
offered two conflicting explanations for the releases and subsequent
rescissions:  (1) that Dr. Cerna was included in the releases by mistake; and (2) that
Dr. Cerna was to pay each of the adult children
$5,000 but the consideration was never paid. 
Dr. Cerna counters that he understood
that the $5,000 for each of the adult children would be paid from the $75,000
tendered by the other three defendants. 
The Liras respond that it is pure fantasy to believe that Mrs. Lira and
the minor children would have agreed to pay the adult children $15,000 from
their settlement proceeds or that the adult children would  release all claims against a doctor who had
tendered nothing.  Dr. Cerna now argues that the withdrawal of his request for attorneys=
fees and costs was conditioned on the representation made by the Liras= attorney that the adult children had
released all claims against him.

While
the trial court certainly had the authority to grant sanctions on these facts,
we cannot conclude that its refusal to do so constitutes an abuse of
discretion.  We overrule Dr. Cerna=s
sole point.  Having overruled all points
of error in both appeals, we affirm the judgment of the court below.

 

August 1, 2002

                                                                        


ANN CRAWFORD McCLURE, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew,
JJ.

 

(Do Not Publish)











[1]  Hipolito Lira, Jr. and
Daniel Lira are the biological minor children of Hipolito
Lira and Estella Lira.  Mr. Lira was also
the father of three adult children who were not named in the original
suit:  Alfredo Lira, Sandra Lira, and
Rosella Bullis.                                                                





[2]  All further
references to the Act relate to this section unless otherwise noted.





[3]  The Liras
ultimately nonsuited the City.  





[4]  We pause to
note that the Liras have suggested Wright v. Bowie Memorial Hospital, 48
S.W.3d 443 (Tex.App.--Fort Worth 2001, no pet.) is
analogous because it involved negligence claims against a physician
assistant.  First, the decision was
reversed by the Supreme Court the day after oral argument in this court.  See Bowie Memorial Hospital v. Wright,
No. 01-0814, slip op. at 3, 2002 WL 1290405, at *3  (Tex. June 13, 2002).  Second, the Supreme Court=s opinion clearly reveals that the Aparties [did] not dispute that the expert report
fairly summarize[d] the alleged standard of care . . . .@  Id. at *3.